| | |
|---|---|
| *quasar energy group, llc,* | ) |
| | ) |
| *Plaintiff* | ) |
| | ) |
| *v.* | )    *No. 2:16-cv-00402-NT* |
| | ) |
| *VGBLADS, LLC, et al.,* | ) |
| | ) |
| *Defendants* | ) |

### *RECOMMENDED DECISION ON DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS*

Defendants VGBLADS, LLC ("VGBLADS") and Village Green Brunswick Landing, LLC ("Village Green") (together, "Village Green Defendants") and defendant Androscoggin Savings Bank ("ASB") jointly move pursuant to Federal Rule of Civil Procedure 12(c) for judgment on the pleadings in this breach of contract action alleging default under a promissory note. *See* Defendants' Joint Motion for Judgment on the Pleadings Under Federal Rule of Civil Procedure 12(c) ("Motion") (ECF No. 28) at 1-2. For the reasons that follow, I recommend that the court deny the Motion.

### I.  Applicable Legal Standards

A motion for judgment on the pleadings pursuant to Rule 12(c) "is treated much like a Rule 12(b)(6) motion to dismiss." *Pérez-Acevedo v. Rivero-Cubano,* 520 F.3d 26, 29 (1st Cir. 2008) (citation omitted). "Because such a motion calls for an assessment of the merits of the case at an embryonic stage, the court must view the facts contained in the pleadings in the light most favorable to the nonmovant and draw all reasonable inferences therefrom to the nonmovant's behoof." *R.G. Fin. Corp. v. Vergara-Nuñez,* 446 F.3d 178, 182 (1st Cir. 2006) (citations omitted). In assessing a Rule 12(c) motion a "court may supplement the facts contained in the pleadings by

considering documents fairly incorporated therein and facts susceptible to judicial notice." *Id.*

There is no resolution of contested facts in connection with a Rule 12(c) motion: a court may enter

judgment on the pleadings only if the properly considered facts conclusively establish the movant's

point." *Id.* (citation omitted).

To withstand a Rule 12(c) motion, "a complaint must contain factual allegations that 'raise

a right to relief above the speculative level, on the assumption that all the allegations in the

complaint are true[.]'" *Pérez-Acevedo,* 520 F.3d at 29 (quoting *Bell Atlantic v. Twombly,* 550 U.S.

544, 555 (2007)). In sum, "to survive a motion for judgment on the pleadings, the complaint must

state a claim that is plausible on its face." *Pineiro v. Gemme,* 937 F.Supp.2d 161, 168-69 (D. Mass.

2013) (citation omitted). "A claim has facial plausibility when the plaintiff pleads factual content

that allows the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## II. Factual Background

The operative complaint, and documents fairly incorporated therein, reveal the following,

relevant to resolution of the Motion.[1]

Plaintiff quasar energy group, llc ("Quasar"), a corporation with a principal place of

business in Ohio, designs and manufactures anaerobic digestion technology that recycles organic

wastes and transforms them into biogas, reusable energy, fertilizer, and organic soil amendments.

Plaintiff Quasar Energy Group, LLC's First Amended Complaint ("First Amended Complaint")

---

[1] As noted, a Rule 12(c) motion is evaluated much like a Rule 12(b)(6) motion, and the First Circuit has instructed that, in reviewing a complaint for sufficiency pursuant to Rule 12(b)(6), a court "should begin by identifying and disregarding statements in the complaint that merely offer legal conclusions couched as fact or threadbare recitals of the elements of a cause of action." *Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 12 (1st Cir. 2011) (citation and internal punctuation omitted). "Non-conclusory factual allegations in the complaint must then be treated as true, even if seemingly incredible." *Id*. "If that factual content, so taken, allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged, the claim has facial plausibility." *Id*. (citation and internal quotation marks omitted).

(ECF No. 21) ¶¶ 1, 7. [2] The Village Green Defendants are Maine corporations with principal places of business in Cumberland County, Maine. *Id*. ¶¶ 2-3.

On or about April 30, 2015, Quasar entered into an Engineering, Procurement, and Construction contract ("EPC Contract") with the Village Green Defendants whereby it agreed, among other things, to design, engineer, and construct an anaerobic digester system on property located at 170 Orion Street in Brunswick, Maine, the former site of the United States Naval Station Brunswick Branch. *Id*. ¶ 8. At all relevant times, Quasar and the Village Green Defendants agreed that, in satisfaction of a portion of the purchase price, the Village Green Defendants would enter into a Subordinate Secured Promissory Note ("Quasar Note") in the amount of $640,000. *Id*. ¶ 9. Quasar provided the Village Green Defendants a loan commitment letter dated December 5, 2014 ("Quasar Commitment Letter"), the provisions of which the Village Green Defendants indicated were satisfactory to them. Quasar Commitment Letter, Exh. 1 (ECF No. 33-1) to Plaintiff quasar energy group, llc's Memorandum in Opposition to Defendants' Joint Motion for Judgment on the Pleadings ("Opposition") (ECF No. 33).

On or about April 30, 2015, ASB, Quasar, and Coastal Enterprises, Inc. ("CEI") entered into an Intercreditor Agreement. Intercreditor Agreement, Exh. 2 (ECF No. 27-2) to Defendants VGBLADS, LLC and Village Green Brunswick Landing, LLC's Answer to Quasar's First Amended Complaint ("Village Green Defendants' Answer") (ECF No. 27). The Village Green Defendants were named as parties to the agreement, although they did not sign it. *Id*. at 1, 11-13. The Intercreditor Agreement provided that, whereas (i) ASB had made a permanent loan of $3.2 million and an interim loan of $1.92 million to VGBLADS in connection with the Brunswick anaerobic digestion facility project ("Project"), (ii) the ASB $1.92 million loan was "to be paid off

---

[2] According to the complaint, the plaintiff's name is in lowercase. *See* First Amended Complaint ¶ 1.

following completion of construction of the Project with the proceeds of an SBA [Small Business Administration] 504 Loan" by Granite State Economic Development Corporation ("GSEDC") in the amount of $1.971 million, (iii) CEI had made a loan of $1.825 million to VGBLADS in connection with the Project, and (iv) Quasar had "committed to make a loan in the principal amount of up to $640,000" ("Quasar Loan") to VGBLADS in connection with the Project, evidenced, *inter alia*, by the "QUASAR Loan Documents" of even or near date therewith, defined in Exhibit F as the "$640,000 Subordinate Secured Promissory Note," the parties had "agreed to enter into this Agreement to establish the relative priorities and rights of their respective loans, liens and encumbrances with respect to the Project." *Id*. at 1-2 & 19, Exh. F.

Quasar warranted, *inter alia*, that the Quasar Loan would be evidenced and secured by the promissory note described in "Exhibit E" and would "be made upon completion of construction by conversion of retainage due Quasar in the amount of $640,000 to the Quasar Loan." *Id*. at 3, § 5. It further stated that the Quasar Commitment Letter referenced in "Exhibit E" had been accepted by VGBLADS and that all conditions capable of being satisfied by the borrower as of the date of the Intercreditor Agreement had been satisfied. *Id*. at 4, § 9.[3]

The Intercreditor Agreement specified that, during construction of the Project, the ASB $3.2 million loan had first priority, the ASB $1.92 million loan had second priority, the CEI loan had third priority, and Quasar "with respect to the QUASAR Loan Documents" had fourth priority. *Id*. at 5, § 11(a). It specified that "[f]rom and after the completion of construction of the Project and the SBA Take-Out," the ASB $3.2 million loan had first priority, the GSEDC loan had second

---

[3] The Intercreditor Agreement mistakenly cited "Exhibit E" as referring to both the Quasar Loan and the Quasar Commitment Letter. Exhibit E pertains to CEI loan documents. Intercreditor Agreement at 18, Exh. E. The only exhibit pertaining to the Quasar Loan is Exhibit F. *Id*. at 19, Exh. F. There is no exhibit pertaining to the Quasar Commitment Letter. This error has no bearing on resolution of the Motion.

priority, the CEI loan had third priority, and Quasar "with respect to the QUASAR Loan Documents" had fourth priority. *Id*. at 5, § 11(b).

In section 13, the Intercreditor Agreement addressed notice of default and the opportunity to cure during two periods: "[d]uring construction of the Project and prior to SBA Take-Out," and "[f]rom and after SBA Take-Out[.]" *Id*. at 6-7, § 13(a)-(c).

Pursuant to section 13(a), during the first period, ASB and CEI agreed "to give written notice of any default under their respective loan documents to each other and to Quasar" and the Village Green Defendants. *Id*. at 6, § 13(a). Section 13(a) also provided that "[a]ny lender shall have the right, but not the obligation, to cure all defaults identified in the notice within thirty (30) days after receipt of any such notice of default[.]" *Id*.

Pursuant to section 13(b), during the first period, Quasar agreed "to give written notice of any default under the Quasar Commitment Letter to the other Lenders" and the Village Green Defendants and to give written notice of any default under the EPC Contract. *Id*. at 7, § 13(b). Section 13(b) provided that, following notice, "[s]uch other lenders shall have the right, but not the obligation, to cure all defaults identified in the notice under the Quasar Commitment Letter and under the EPC Contract within sixty (60) days after receipt of any such notice of default[.]" *Id*. The Village Green Defendants were to "have the same time periods to cure defaults under the Quasar Commitment Letter." *Id*. Section 13(b) further stated:

> Quasar further agrees that so long as [the Village Green Defendants] are not in default under the EPC Contract, or provided that such defaults have been cured, and provided that any defaults under the Quasar Commitment Letter have been cured, it will make the Quasar Loan at the time of completion of construction of the Project, and will consent to the assignment of the Quasar Commitment Letter and Quasar Loans to any subsequent owner of the Project . . . .

*Id*.

With respect to the second period, "[f]rom and after SBA Take-Out," section 13(c) provided that "the Lenders agree to give written notice of any default under their respective loan documents to each other" and to the Village Green Defendants, with "[a]ll lenders" having the right but not the obligation to cure all defaults identified in the notice within 60 days. *Id*. at 7, § 13(c).

Finally, section 13(d) provided, "The Lenders agree to accept all curative acts of each other." *Id*. at 7, ¶ 13(d).

The Intercreditor Agreement was signed by ASB and CEI on April 29, 2015, and by Quasar on April 30, 2015. *Id*. at 11-13. On April 30, 2015, the Village Green Defendants signed the Quasar Note, which extended the option of borrowing any amount from zero to $640,000 at the time of final completion of the Project. Quasar Note, Exh. 1 (ECF No. 21-1) to First Amended Complaint. The Quasar Note provided that, if the Village Green Defendants failed to pay any amount due under the Note and the failure continued for 20 days after the due date, Quasar could, at its option, by written notice to the Village Green Defendants, "declare the entire principal amount of this Note, together with all accrued interest thereon, immediately due and payable[.]" *Id*. at [2]-[3].

The Quasar Note, by its terms, is subject to the Intercreditor Agreement, providing: "In the event of any conflicts between the Note and the Intercreditor Agreement, the terms of the Intercreditor Agreement will govern." *Id*. at [4]. *See also* Intercreditor Agreement at 9, § 19 (same).

The Project was finally completed pursuant to the EPC Contract on or before March 28, 2016. First Amended Complaint ¶ 16. The Village Green Defendants took possession of, and began operations of the equipment on, the Project site on or before March 28, 2016, and confirmed

to Quasar on or before March 29, 2016, that the final completion of the EPC Contract had occurred. *Id*. ¶¶ 17-18.

The Village Green Defendants were obligated to make an interest-only payment in the amount of $3,200 to Quasar on April 1, 2016. *Id*. ¶ 19. They failed to do so, and the failure continued for more than 20 days. *Id*. ¶ 20.

By letter dated May 26, 2016, copied to ASB and CEI, Quasar notified the Village Green Defendants of their breach of the Quasar Note, accelerated the total amount due, and demanded immediate payment of the principal sum of $640,000 together with applicable interest and reasonable costs and expenses. *Id*. ¶ 21 & Exh. B ("Notice of Default") (ECF No. 21-2) thereto. At all relevant times, the Village Green Defendants have refused and failed to remit the sum of $640,000, plus interest, costs, and expenses, to Quasar. First Amended Complaint ¶ 22.

By letter dated July 29, 2016, Quasar confirmed to ASB that it had received a July 25, 2016, letter from ASB enclosing a check in the amount of $21,697.44 purportedly attempting to cure the Village Green Defendants' default. Exh. 1 (ECF No. 27-1) to Village Green Defendants' Answer. Quasar stated that it would negotiate the check without prejudice and under protest. *Id*. On August 5, 2016, Quasar filed the instant suit, alleging breach of promissory note and seeking costs and expenses, including attorney fees. Complaint (ECF No. 1).

As of the date of the First Amended Complaint, October 28, 2016, the SBA Take-Out had not occurred. First Amended Complaint ¶ 25.

### III.  Discussion

The Defendants seek judgment on the pleadings on the basis that Quasar's suit is predicated on the mistaken view that section 13(b) of the Intercreditor Agreement did not permit ASB to cure the Village Green Defendants' default. *See* Motion at 10-18. For the reasons that follow, I

7

conclude that the Defendants fail to meet their burden of demonstrating entitlement to judgment on the pleadings as a matter of law.

Under Maine law, "[d]etermining whether or not a contract is ambiguous is a question of law." *Workgroup Tech. Partners, Inc. v. Anthem, Inc.*, No. 2:15-cv-00002-JAW, 2016 WL 424960, at \*15 (D. Me. Feb. 3, 2016) (citation and internal quotation marks omitted). "Contract language is only ambiguous when it is reasonably susceptible to different interpretations." *Id.* (citation and internal punctuation omitted). "If a court determines that a contract is unambiguous, its interpretation is also a question of law." *Id.* (citation and internal quotation marks omitted). "On the other hand, if the contract is ambiguous, then its interpretation is a question of fact for the factfinder." *Id.* (citation and internal quotation marks omitted).

"The interpretation of an unambiguous contract must be determined from the plain meaning of the language used and from the four corners of the instrument without resort to extrinsic evidence." *Id.* (citation and internal quotation marks omitted). "A contract should be construed to give force and effect to all of its provisions and not in a way that renders any of its provisions meaningless." *Id.* (citation and internal punctuation omitted). "To do so, all parts and clauses must be considered together that it may be seen if and how one clause is explained, modified, limited or controlled by the others." *Id.* (citation and internal punctuation omitted). *See also, e.g., Handy Boat Serv. Inc. v. Professional Servs., Inc.*, 1998 ME 134, ¶ 7, 711 A.2d 1306, 1308 ("A contract is to be interpreted to effect the parties' intentions as reflected in the written instrument, construed with regard for the subject matter, motive, and purpose of the agreement, as well as the object to be accomplished.").

The Defendants contend that the plain meaning of the Intercreditor Agreement, its purpose, and Quasar's own actions make clear that ASB had the right pursuant to section 13(b) to cure the

Village Green Defendants' default. *See* Motion at 2. Quasar rejoins that the Intercreditor Agreement plainly did not permit ASB the right to cure and that "extrinsic evidence" in the form of the parties' purpose/motive and course of dealing cannot be considered. *See* Opposition at 6-12. It argues, in the alternative, that if this "extrinsic evidence" is considered, it supports Quasar's interpretation, not that of the Defendants. *Id*. at 9-12.

### 1. Plain Meaning

As the Defendants acknowledge, *see* Motion at 13, section 13(b) of the Intercreditor Agreement does not expressly employ the term "Promissory Note[,]" Intercreditor Agreement at 7, § 13(b). However, they argue, that term could not have been used as of April 29, 2015, when ASB and CEI signed the Intercreditor Agreement, because the Quasar Note had not yet been executed. *See* Motion at 13. They contend that, in the circumstances, the most accurate way to refer to the contingent future loan that Quasar had agreed to make at the borrowers' election was to term it the "Quasar Commitment Letter." *See id*. at 13-14.

They add that, in any event, "[t]he only sensible reading" of the Intercreditor Agreement's right-to-cure provision with respect to Quasar is that it allows the same cure rights for Quasar's future loan as for the loans that the other lenders had already made. *Id*. at 14. This is so, they argue, because the right-to-cure language is the same in both section 13(a), pertaining to the ASB and CEI loans, and section 13(b), pertaining to the future Quasar loan, and because it is nonsensical to afford another lender a right to cure a borrower's default under a commitment letter. *See id*. at 14-15. They assert that "[a] borrower could not default under a lender's commitment to loan, [because] nothing has been borrowed and nothing has been lent"; instead, "[a] borrower defaults on a loan." *Id*. at 15.

However, as Quasar observes, *see* Opposition at 7-8, the parties expressly referred to the Quasar Note in other sections of the agreement, defining the term "QUASAR Loan Documents" to mean the Quasar Note, *see* Intercreditor Agreement at 2, 3 § 5, 4 § 9, & 19, Exh. F. Accordingly, as Quasar points out, *see* Opposition at 8, the parties could have referred to the Quasar Note simply by using the defined term "QUASAR Loan Documents."

In addition, section 13(c) of the agreement, pertaining to the time period after the SBA Take-Out, expressly provides a right to cure defaults under *all of the lenders'* respective loan documents. *See* Intercreditor Agreement at 7, § 13(c). As Quasar suggests, *see* Opposition at 9, the parties could have employed similar language in section 13(b) had they intended to permit other lenders to cure defaults of the Quasar Note during construction of the Project and prior to the SBA Take-Out.

Moreover, Quasar argues, the provision for cure of defaults of the Quasar Commitment Letter and EPC Contract was a deliberate choice that made sense in the circumstances. *See* Opposition at 10. Quasar plausibly contends that the parties had reason to provide for the cure of defaults of the Quasar Commitment Letter: to ensure that Quasar would remain obligated to make the Quasar Loan through the Quasar Note upon the completion of the Project. *See id.* Consistent with that interpretation, section 13(b) pertains to the period "[d]uring construction of the Project[,]" Intercreditor Agreement at 7, § 13(b), prior to the time that the Village Green Defendants were to decide whether to exercise their option to borrow up to $640,000 from Quasar, *see* Quasar Note at [1] (option to borrow "shall be exercised by Makers [the Village Green Defendants] at the time of Final Completion (reference EPC)"). The Defendants' general argument that a borrower cannot default on a lender's commitment letter is unpersuasive.[4]

---

[4] The Defendants argue that the court need not consider the Quasar Commitment Letter because the terms of the Intercreditor Agreement are unambiguous, but that if it is considered, its terms belie Quasar's argument. *See*

## 2. Purpose

The Defendants further argue that Quasar's reading of section 13(b) destroys the basic purpose of the Intercreditors' Agreement: to allow lenders to cure defaults that their common borrowers might incur, preventing the borrowers' default on one loan from imperiling the borrowers' ability to make good on their other loans. *See* Motion at 15-16. They contend that "Quasar's interpretation of the Agreement would create a netherworld in which, until the SBA takeout, the senior lender's defaults could be cured, but not Quasar's." *Id*. at 16 (footnote omitted). They assert that this contravenes the purpose of the default-and-cure provision, which is "to afford lenders with more at stake the ability to prevent their interests from being undermined by actions taken by another creditor." *Id*. at 17.

Yet, as Quasar rejoins, *see* Opposition at 11, the purpose of the Intercreditor Agreement, insofar as can be gleaned from the four corners of that contract, is "to establish the relative priorities and rights of [the lenders'] respective loans, liens and encumbrances with respect to the Project[,]" Intercreditor Agreement at 2. Quasar plausibly argues that, from the point of view of the senior lienholder, ASB, this goal was accomplished by ensuring that Quasar's retainage of $640,000 would be converted into a promissory note that could be subordinated to ASB's liens rather than remaining a debt immediately due Quasar for work performed. *See* Opposition at 11. Quasar further asserts that there were reasons why it had a greater need to cure any default by the

---

Defendants' Reply in Support of Joint Motion for Judgment on the Pleadings Under Federal Rule of Civil Procedure 12(c) ("Reply") (ECF No. 34) at 4 n.1. Specifically, they contend that, because the Quasar Commitment Letter defines a "default" as a "failure to punctually pay the loan," a default under the Quasar Commitment Letter constitutes a default under the Quasar Note, permitting ASB to cure that default. *See id*. Assuming that it is appropriate to consider the terms of the Quasar Commitment Letter, which is expressly referenced in the Intercreditor Agreement, the section on which the Defendants rely merely states that the *loan documents* will contain standard language regarding defaults, including language providing that a failure to pay punctually constitutes a default. *See* Quasar Commitment Letter at [3]. Thus, the failure to pay the Quasar Note punctually is not a default pursuant to the Quasar Commitment Letter. On the other hand, the Quasar Commitment Letter, which the Village Green Defendants signed, set forth conditions on which Quasar would extend the loan. *See id*. at [2]-[4]. The Village Green Defendants, hence, could have defaulted on the Quasar Commitment Letter, jeopardizing the making of the Quasar Loan.

Village Green Defendants than did the senior lienholders, including that, as junior lienholder, it would be the last to be paid in the event of a default and stood to lose the most. *See id*. at 10-11.

### 3. Course of Performance

The Defendants finally rely on Quasar's own conduct to bolster their interpretation of section 13(b) of the Intercreditor Agreement, pointing out that Quasar acted in accordance with that section in providing a "Notice of Event of Default" to ASB and CEI in the manner specified in section 18 (certified mail, return receipt requested). *See* Motion at 17-18; Intercreditor Agreement at 7, § 13(b) & 9, § 18. They contend that Quasar's own actions belie its argument that section 13(b) did not apply. *See id*.

Quasar disputes that its "courtesy notice" to ASB of the default "somehow rewrites the Intercreditor Agreement[,]" asserting that the Defendants inappropriately rely on evidence outside of the four corners of that agreement. Opposition at 11. It points out that the agreement contains an integration clause that provides, *inter alia*, that the agreement "shall not be amended or modified in any manner, except by written agreement signed by all parties to this Agreement." *Id*. at 12 (quoting Intercreditor Agreement at 9, § 19).

The Defendants correctly observe that "course of performance" evidence can be considered absent a determination that contractual terms are ambiguous. *See* Reply at 5-6; Restatement (Second) of Contracts ("Restatement") § 202 & cmt. a (Am. Law Inst. 1981) (listing five "special rules" of contractual interpretation that do not require a determination of ambiguity, two of which pertain to course of performance); *see also, e.g., Reed & Reed, Inc. v. Weeks Marine, In*c., 431 F.3d 384, 388 (1st Cir. 2005) (quoting comment g to Restatement § 202, in case involving interpretation of contract pursuant to Maine law, for proposition that "'[t]he parties to an agreement

know best what they meant,' and thus the parties' subsequent course of performance may be instructive in contract interpretation").

However, in this case, as in *Weeks Marine*, the Defendants' evidence is not determinative as a matter of law. *See id.* at 388 (import of conduct of plaintiff on which defendant relied to prove contract's meaning was itself unclear).

The two special rules pertinent to course of performance are:

(4) Where an agreement involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement.

(5) Wherever reasonable, the manifestations of intention of the parties to a promise or agreement are interpreted as consistent with each other and with any relevant course of performance, course of dealing, or usage of trade.

Restatement § 202.

The first rule, set forth in subsection (4), is inapposite because the Defendants rely on a solitary instance of conduct, Quasar's giving of notice of the default at issue to ASB and CEI in accordance with the notice/cure provisions of the Intercreditor Agreement. *See* Motion at 17-18; Reply at 5-6; Restatement § 202 cmt. g ("The rule of Subsection (4) does not apply to action on a single occasion or to action of one party only[.]").

The Defendants rely on comment g's further observation that, although the rule does not apply to action on a single occasion, "in such cases the conduct of a party may be evidence against him that he had knowledge or reason to know of the other party's meaning[.]" Reply at 5; Restatement § 202 cmt. g. However, given that subsection (4) is inapposite, I understand that portion of comment g to mean that, if a contract is found ambiguous, extrinsic evidence of a single instance of conduct may be admissible against a party. The Defendants do not argue that the contract provision at issue is ambiguous. *See* Motion at 1.

13

Nor is application of the second rule, set forth in subsection (5), determinative in the Defendants' favor. Again, the Defendants point to a single instance of conduct rather than a "relevant course of performance" or "course of dealing[,]" Restatement § 202(5). In any event, drawing reasonable inferences in Quasar's favor as nonmovant, Quasar asserts that it gave notice to ASB and CEI in the manner contemplated in the Intercreditor Agreement as a courtesy. *See* Opposition at 11.

For all of the foregoing reasons, I conclude that the Defendants fail to carry their burden of demonstrating their entitlement to judgment on the pleadings on the basis that section 13(b) of the Intercreditor Agreement plainly and unambiguously gave ASB the right to cure the breach of the Quasar Note at issue.[5]

## IV. Conclusion

For the foregoing reasons, I recommend that the court **DENY** the Motion.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, within fourteen (14) days after being served with a copy thereof. A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 28th day of July, 2017.

/s/ John H. Rich III
John H. Rich III
United States Magistrate Judge

---

[5] I do not reach Quasar's additional argument, *see* Opposition at 12-13, that the Village Green Defendants lack standing to seek judgment on the pleadings as to their counterclaims for declaratory judgment and breach of contract, *see* Motion at 6-7.